1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **EASTERN DISTRICT OF CALIFORNIA**
10

11   JAIME VINICIO ORTIZ DONIS,                Case No. 1:25-CV-01228 JLT SAB
12                        Petitioner,          ORDER GRANTING PRELIMINARY
                                               INJUNCTION[1]
13   v.
                                               (Doc. 5)
14   CHRISTOPHER CHESTNUT, ET AL.,
15                        Respondents.

16   **I.      INTRODUCTION**

17          Jaime Vinicio Ortiz Donis, a 43-year-old native of Guatemala, crossed the border into the

18   United States in May 2005. (Doc 5-1, ¶ 6.) He is a husband and father of three children, one of

19   whom is a U.S. Citizen. (Doc. 1, ¶ 1.) After being encountered by Customs and Border Patrol

20   agents near Brownsville, Texas, Mr. Ortiz was processed by Immigration and Customs

21   Enforcement for removal proceedings pursuant to 8 U.S.C. 1229(a) (INA § 240). (Doc. 10-1 at 6–

22   7.) Petitioner was charged as inadmissible under Immigration and Nationality Act

23   § 212(a)(6)(A)(i) (8 U.S.C. § 1182(a)(6)(A)(i)) as a noncitizen not admitted or paroled into the

24   United States. (Doc. 10-1 at 11.)

25          At some point shortly after his initial detention, Mr. Ortiz was released into the country

26   _____

27   [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
     preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
     required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
28   granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
     Preliminary Injunction.

1    under his own recognizance "due to lack of detention space" to await his immigration court

2    hearing. (Doc. 10-1 at 6–7.) In doing so, immigration officials necessarily determined that Mr.

3    Ortiz did not present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8)

4    ("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an

5    alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and

6    (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such

7    release would not pose a danger to property or persons, and that the alien is likely to appear for

8    any future proceeding.").

9            On May 31, 2005, the day that Mr. Ortiz entered the United States, the government served

10   Petitioner with a notice to appear (NTA) pursuant INA § 240. (Doc. 10-1 at 9-11). The CBA did

11   not check the box on the NTA indicating, "You are an arriving alien." *Id*. Instead, the CBA

12   checked the box indicating that Petitioner was "in removal proceedings under section 240."

13   However, the Department of Homeland Security failed to file the NTA with the immigration

14   court for over a year, finally doing so on August 16, 2006. (Doc. 10-1 at 15.) In the interim,

15   Petitioner tried to update his address with the immigration court, but the court denied his request

16   for "insufficient information." (*Id*.)

17           Once DHS filed Petitioner's NTA in August 2006, the immigration court subsequently

18   mailed Petitioner a hearing notice for his § 240 removal hearing. (Doc. 5-2 at 6.) However,

19   because Petitioner had already moved and unsuccessfully attempted to update his address with the

20   court, he did not receive the hearing notice in the mail. (Doc. 5-1, ¶ 8.) Consequently, Mr. Ortiz

21   failed to attend his removal hearing on September 15, 2006, and an immigration judge ordered

22   him removed in absentia. (Doc. 10-1 at 13.)

23           In July 2025, DHS and the Department of Justice adopted a new interpretation of 8 U.S.C.

24   § 1182(a)(6)(A)(i). According to this new interpretation, a noncitizen like Mr. Ortiz, i.e., a

25   noncitizen alleged to be present in the country without admission and who would have previously

26   been detained by DHS under 8 U.S.C. § 1226 and offered a bond hearing unless subject to

27   criminal detention, would now be considered an "applicant for admission" and therefore subject

28   to mandatory detention under 8 U.S.C. 1225(b)(2)(A). (Doc. 5-2 at 15; Doc. 5-1, ¶ 13.) The

1    Board of Immigration Appeals affirmed this new interpretation in *Matter Yajure Hurtado*, 29

2    I&N Dec. 216, 220 (BIA 2025). (Doc. 5-1, ¶ 13; Doc. 10 at 4-5.)

3         Almost two decades after an IJ ordered him removed in absentia, ICE officers arrested

4    Mr. Ortiz outside his Rancho Cordova home on June 17, 2025. (Doc. 5-1, ¶10; Doc. 10-1, ¶ 10.)

5    The government claims authority to subject Petitioner to mandatory detention pursuant to 8

6    U.S.C. § 1225(b)(2)(A). (Doc. 10-1, ¶ 11.) After being placed in DHS custody, Petitioner was

7    transported first to the Mesa Verde ICE Processing Facility in Bakersfield, CA on June 17, 2025

8    (Doc. 10-1, ¶ 10); then, on June 24, 2025, to the Florence Service Processing Center in Florence,

9    AZ (*id*., ¶ 12); and finally, on June 26, 2025, to the El Paso Service Processing Center in El Paso,

10   TX. (*Id*., ¶ 14.) Petitioner had limited contact with his attorney during his detention in El Paso,

11   including a period during which he was unable to communicate for several days except for one,

12   two-minute phone call. (Doc. 5-1, ¶ 10)

13        One evening, on an unknown date, DHS officers placed Mr. Ortiz on a plane and told him

14   that he would be deported to Guatemala, thereby executing his 2006 removal order. (Doc. 5-1,

15   ¶ 10.) However, by that time Petitioner had filed a motion with the immigration court to reopen

16   his INA § 240 removal proceedings and rescind his 2006 in absentia removal order. (*Id*., ¶ 11;

17   Doc. 10-1, ¶ 13.) The filing of this motion triggered an automatic stay of Petitioner's as-of-yet

18   unexecuted removal order. (Doc. 5-1, ¶ 11; Doc. 10-1, ¶ 13.) Upon learning of the stay, DHS

19   removed Petitioner from the plane and returned him to the El Paso detention facility. (Doc. 5-1 at

20   ¶ 11.) On June 30, 2025, the government transferred Mr. Ortiz back through the Arizona Removal

21   Operations Coordination Center in Phoenix, to the Mesa Verde facility in Bakersfield, California,

22   where he arrived on July 1, 2025. (Doc. 10-1, ¶¶ 15-16.) Following his return to California, Mr.

23   Ortiz was transferred to the California City detention center in Kern County on August 28, 2025,

24   (*Id*., ¶ 19), where he remains detained. (Doc. 5-1, ¶11.)

25        On July 11, 2025, Petitioner filed a motion to reopen his 2006 in absentia removal order.

26   (Doc. 10-1, ¶ 17.) On August 11, 2025, an IJ exercised "its *sua sponte* authority" to grant

27   Petitioner's motion to reopen his § 240 removal proceedings and rescinded the 2006 *in absentia*

28   removal order. (Doc. 10-1 at 15; Doc. 5-1, ¶ 12.) As a result of this recission, Mr. Ortiz contends

he is back in § 240 removal proceedings, with eligibility to file applications for relief from removal under asylum, withholding of removal, Convention Against Torture protection, and E42B removal cancellation claims. (Doc. 5-1 at ¶ 12.) On August 12, 2025, the immigration court served notice on both Mr. Ortiz and the government for a master immigration hearing pursuant to Petitioner's reopened removal proceedings to be held on October 1, 2025.[2] (Doc. 10-1 at 15-16.) Petitioner filed a request for a bond hearing before an IJ on Aug. 25, 2025, but no hearing date has been scheduled. (Doc. 5-1, ¶ 14.)[3]

According to the Petition, Mr. Ortiz's continued detention harms him in the following ways:

> His continued detention will greatly complicate his ability to present his asylum, withholding, and CAT claims to the immigration court in order to seek relief from removal, it will prevent him from working and being able to pay for an attorney to represent him before the immigration court, and therefore will greatly impede his ability to find legal assistance for the remainder of his case. Immigration proceedings aside, it will pose a compounding psychological burden, in addition to whatever physical hardships he has to endure from prison conditions. It will deprive him of his livelihood and ability to support his wife and three daughters. His family's deep despair over his continued detention has already negatively impacted Mr. Ortiz's mental health. Continued detention deprives Mr. Ortiz of his community, his family, and his life as he knows it.

(Doc. 1, ¶ 81.)

On September 18, 2025, Mr. Ortiz filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that his detention violates the INA, executive agency bond regulations, and the rights to both substantive and procedural due process under the Fifth Amendment. (Doc. 1.) He has also filed an ex parte motion for a temporary restraining order that seeks the following relief: (1) immediate release from Respondents' custody and an injunction barring Respondents from re-detaining Petitioner absent a further order of this Court; (2) in the alternative, immediate release from Respondents' custody and an injunction barring Respondents from re-detaining Petitioner unless they demonstrate at a pre-deprivation bond hearing, by clear and convincing

---

[2] Petitioner's counsel indicated that this hearing has been continued to November due to the firing of the IJ set to handle the October 1 calendar.

[3] The government's current interpretation of 8 U.S.C. § 1182(a)(6)(A)(i) forecloses any such request. (*Id.*); *see also Yajure Hurtado*, 26 I&N Dec. 216.

evidence, that Mr. Ortiz is a flight risk or danger to the community such that physical custody is required; (3) in the alternative, ordering Respondents to release Petitioner if he is not provided a custody redetermination hearing pursuant to 8 U.S.C. § 1226(a) within seven days of the TRO; and (4) an order prohibiting the government from transferring Mr. Ortiz out of this District and/or removing him from the country until these habeas proceedings have concluded. (Doc. 5-2 at 24.)

On September 19, 2025, the Court issued a Minute Order expressing the preliminary belief that Petitioner likely can demonstrate that his circumstances warrant the same relief as the Court ordered for Petitioner Vasquez Perez in *Espinoza v. Kaiser*, No. 1:25-CV-01101 JLT SKO, 2025 WL 2581185 (E.D. Cal. Sept 5, 2025). (Doc. 8.) The Court ordered Respondents to show cause in writing why the Court should not grant Petitioner's motion for a temporary restraining order and scheduled the matter for a hearing. (*Id.*) The Court ordered the government not to remove Petitioner from the country or out of the Eastern District of California in the meantime without the permission of the Court. (*Id.*) On September 29, 2025, Respondents filed their opposition brief to Petitioner's motion for a temporary restraining order. (Doc. 10) Petitioner filed a reply brief on October 2, 2025. (Doc. 11)

For the reasons set forth below, the Court converts the matter to a motion for preliminary injunction and **GRANTS** the motion

## II.    LEGAL BACKGROUND

### A.  Statutory Immigration Framework (8 U.S.C. § 1225 and § 1226)

Two statutes govern the detention and removal of inadmissible noncitizens from the United States: 8 U.S.C. § 1226 and § 1225. In the interest of expedience, the Court relies here, as relevant, on the legal background accurately presented by the district court in *Salcedo Aceros v. Kaiser*, No. 25-CV-06924-EMC, 2025 WL 2637503 (N.D. Cal. Sept 12, 2025):

> ### A.  Full Removal Proceedings and Discretionary Detention (§ 1226)
>
> The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and

detained" and that the government "may release the alien on ... conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest that noncitizen absent a change in circumstance. *See Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021). Where the release decision was made by a DHS officer, not an immigration judge, the Government's practice has been to require a showing of changed circumstances before re-arrest. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

## B. Expedited Removal and Mandatory Detention (§ 1225)

While "§ 1226 applies to aliens already present in the United States," U.S. immigration law also "authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," a process that provides for expedited removal. *Jennings*, 583 U.S. at 303 (2018). Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1). § 1225(b)(1) provides that:

> "If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7)], the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 208 [8 USCS § 1158] or a fear of persecution."

Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer

to noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. Clause (iii) of § 1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited removal. First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or failure to meet document requirements. The implementing agency regulations define "arriving alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. The second group –designated noncitizens –includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,' " that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025). In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days. *Id.* This was the status quo until January, 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute." Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025). Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation. In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the

officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

[Section] 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

## C. The Government's Recent Change in Position

Until this year, the DHS has applied § 1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation. This practice was codified by regulation. The regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended." Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954)). And in its briefing before this Court, the Government acknowledges that "until recently," it considered § 1226(a) to be an available detention authority for noncitizens who might also be subject to § 1225. Dkt. No. 15 at 6.

In 2025, however, the Government's policy changed dramatically. The DHS revised its § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute.*" Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added). The Secretary of Homeland Security memorandum directed federal immigration officers to "consider ...

whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1 at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding and/or any active parole status." *Id.* The memorandum states that DHS shall take the actions contemplated by the memorandum "in a manner that takes account of legitimate reliance interests," but states that "the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner." Huffman Memorandum (Jan. 23, 2025)

Since mid-May of 2025, the Department of Homeland Security has made a practice of appearing at regular removal proceedings in immigration court, moving to dismiss the proceedings, and then re-arresting the individual in order to place them in expedited removal proceedings. Dkt. No. 1 at ¶¶ 35–40. If the immigration judge does not dismiss the full removal proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention provision.

*Salcedo Aceros*, 2025 WL 2637503 at *1-4. (internal footnotes omitted)

## III.    REQUEST FOR INJUNCTIVE RELIEF

### A.    Jurisdiction

#### 1.    Habeas Corpus

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts they are being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Petitioner seeks immediate release from custody, which he contends violates the Constitution of the United States. (*See* Doc. 1.) Thus, he properly invokes the Court's habeas jurisdiction.

#### 2.    Judicial Review under the INA

The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien," there are no final removal orders at issue here. An IJ rescinded Petitioner's removal order in August 2025. The Court is also not reviewing the executive's decision to conduct removal proceedings against Petitioner. Thus, the

1    Court has the authority to review the authority under which Respondent claims to detain

2    Petitioner. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes

3    judicial review only as to the three areas specifically outlined in the subsection); *see also Reno v.*

4    *American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

5           **B.  Likelihood of Success on the Merits**

6           This first factor "is the most important" under *Winter*, and "is especially important when a

7    plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

8    Cir. 2023).

9                   **a.    *Respondent Relies on an Incorrect Interpretation of § 1225 for the***

10                           ***Authority to Detain Respondent***

11          Respondent's central argument is that Mr. Ortiz is subject to "mandatory detention"

12   pending removal proceedings under 8 U.S.C. § 1225(a)(1), 1225(b)(2)(A). (Doc. 10 at 1.) As

13   support, Respondent cites to the BIA's recent decision in *Yajure Hurtado* affirming the

14   government's new interpretation of § 1225. (Doc. 10 at 4.) This Court has reviewed and

15   considered the parties arguments as to the government's interpretation adopted by *Yajure*

16   *Hurtado*. In the interest of expedience, and because it addresses the most central arguments raised

17   here, the Court relies on the analysis set forth in detail in *Salcedo*:

18                   Ms. Salcedo Aceros argues that § 1225(b)(2) does not apply to
19                   noncitizens like her, who have been released by DHS on their own
                     recognizance into the interior of the country. Dkt. No. 17 at 4. A
20                   number of district courts that have examined this issue in recent
                     months have so held. These courts have rejected the Government's
21                   expansive construction of § 1225(b)(2), which would allow it to
                     detain without a hearing virtually any noncitizen not lawfully
22                   admitted. These courts examined the text, structure, agency
                     application, and legislative history of 1225(b)(2) and concluded that
23                   it applies only to noncitizens "seeking admission," a category that
                     does not include noncitizens like Ms. Salcedo Aceros, living in the
24                   interior of the country. *See Gomes v. Hyde*, No. 1:25-CV-11571-
                     JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain
25                   text of Sections 1225 and 1226, together with the structure of the
                     larger statutory scheme, indicates that Section 1225(b)(2) does not
26                   apply to noncitizens who are arrested on a warrant issued by the
                     Attorney General while residing in the United States."); *Lopez*
27                   *Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at
                     *5 (S.D.N.Y. Aug. 13, 2025) (holding 1225(b)(2) "clearly" not
28                   applicable to noncitizens who have resided in the country for years);
                     *Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 U.S.

Dist. LEXIS 156344, at *29 (D. Ariz. Aug. 11, 2025) (finding that the Government's "selective reading" of 1225(b)(2) "violates the rule against surplusage and negates the plain meaning of the text"); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (rejecting the Government's "novel interpretation" that 1225(b) applies to noncitizens detained while present in the United States); *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (holding that Section 1226, not 1225(b)(2), governed inadmissible noncitizens residing in the country).

The Government has not pointed to a single district court that has agreed with its construction of 1225(b)(2). Instead, the Government points to a recent BIA decision agreeing with its interpretation. Dkt. No. 22 (citing *Matter of Jonathan Javier Yajure Hurtado*, 29I & N Dec. 216 (BIA 2025)). There, the BIA held that Section 1225(b)(2) prescribes mandatory detention for all inadmissible noncitizens living in the United States. For the reasons discussed below, the Court finds the conclusion of the district courts more persuasive than the BIA's new ruling.

First, the BIA decision is entitled to little deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (observing that while "agencies have no special competence in resolving statutory ambiguities," "[c]ourts do"). Under *Skidmore*, the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). In this regard, the BIA's current position is inconsistent with its earlier pronouncements. Prior to its September 5 decision, the BIA issued three non-precedential decisions taking the *opposite* position. *See Martinez*, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025). In one decision, the Board even stated that it was "unaware of any precedent" that would support the Government's position. *Id.* Under *Loper*, the Court has no obligation to defer to the BIA's view, particularly when that view has not "remained consistent over time." *Loper*, 603 U.S. at 386; *see also Skidmore*, 323 U.S. at 140.

Moreover, the BIA's reasoning lacks persuasive power for several reasons.

*i.*

As with any question of statutory interpretation, the Court begins with the relevant statutory provisions. § 1225(a) defines an applicant for admission as:

> "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) ..."

§ 1225(b)(2)(A) states:

> "[I]n the case of an alien who is an applicant for admission,

> if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."

The Government argues and the BIA agreed that every noncitizen who has not been lawfully admitted to the United States continues to be a noncitizen "seeking admission" and thus subject to § 1225(b)(2). In other words, it treats the phrases "applicant for admission" and "seeking admission" as synonymous.

But this reading would render the phrase "seeking admission" in § 1225(b) superfluous. To qualify for § 1225(b)(2), a noncitizen must (1) be an applicant for admission, (2) be "seeking admission", and (3) be "not clearly and beyond a doubt entitled to be admitted." If, as the Government argues, all applicants for admission are deemed to be "seeking admission" for as long as they remain applicants, then the phrase "seeking admission" would add nothing to the provision. This "violates the rule against surplusage." *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025); *see also United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning."); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Moreover, the Government's and the BIA's reading of "seeking admission" is unnatural and ignores the tense of the term. As one district court observed:

> "[S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there."

*Lopez Benitez*, 2025 WL 2371588, at *7.

*ii.*

Indeed, the Government's and BIA's position conflicts with the implementing regulation for § 1225(b). *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024) (implementing regulations may provide a "useful reference point for understanding a statutory scheme" when issued "contemporaneously"). 8 C.F.R. § 235.3 describes Section 1225(b)(2) as applying to "any *arriving alien* who appears to the inspecting officer to be inadmissible." (Emphasis added.) The regulation thus contemplates that "applicants *seeking admission*" are a subset of applicants "roughly interchangeable" with

"arriving aliens." *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025). "Arriving aliens" are specifically defined by regulation as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. This plainly does not describe Ms. Salcedo Aceros. Indeed, the DHS's Notice to Appear form similarly distinguishes between "arriving alien" and "alien present in the United States who has not been admitted or paroled." Dkt. No. 16-2.

☐ You are an arriving alien.
☒ You are an alien present in the United States who has not been admitted or paroled.
☐ You have been admitted to the United States, but are removable for the reasons stated below.

These regulations and forms presume that the term alien "seeking admission" has limited application, not the sweeping construction given to it by the BIA.

*iii.*

Another "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 140–41 (2019). Here, the Government's interpretation would "nullify" a recent amendment to the immigration statutes. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025). Section 1226 generally establishes a discretionary detention framework, but provides that for certain noncitizens, detention is mandatory. Section 1226(c). In January of *this year*, Congress amended Section 1226 to add an additional category of citizens subject to mandatory detention. Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). This category includes noncitizens who are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C) [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one of certain enumerated crimes. *Id.* If the Government's view is correct, however, all noncitizens who are inadmissible are *already* subject to mandatory detention under § 1225(b)(2), whether or not they have been charged with a qualifying crime and thus are subject to § 1226(c). This view would render the Laken Riley Act a meaningless amendment, since it would have prescribed mandatory detention for noncitizens already subject to it. But "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). If Congress amended Section 1226 to create mandatory detention for certain inadmissible noncitizens, it follows that those noncitizens were not already subject to mandatory detention. Thus, the scope of Section 1225(b)(2) cannot be as broad as the government argues.

*iv.*

In addressing whether a noncitizen who has lived for years within the United States can be considered "seeking admission," the BIA expressed concern that if a noncitizen is not "admitted" to the United States but is not deemed "seeking admission," then the noncitizen's legal status would present a "legal conundrum." *Id.* at 221. The BIA did not further elaborate, but presumably its concern was that such an individual would have no legal status under the immigration code. This concern is misplaced. The statute explicitly provides a term of art for someone who is not "admitted" but is not *necessarily* "seeking admission": such noncitizens fall into the broader category of "applicants for admission." As noted, otherwise the language in 1225(b)(2), which treats noncitizens "seeking admission" as a subset of "applicants for admission" would be superfluous. All "applicants for admission" have some legal status whether they belong to the subset of those seeking admissions or not.

The BIA also reasoned that petitioner's argument for a narrower construction of Section 1225(b)(2) left unanswered which applicants for admission would be covered by that section if applicants for admission who have lived within the United States for years are excluded from its reach. *Id.* In other words, the BIA believed that an interpretation of § 1225(b)(2) that does not cover all applicants for admission would render § 1225(b)(2) an empty set. Not so. Most obviously, § 1225(b)(2) applies to arriving noncitizens who are inadmissible on grounds other than 8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7) (which are the grounds that put an arriving noncitizen on the track for expedited removal). The statute governing inadmissibility lists ten grounds for inadmissibility, many of which have distinct sub-grounds. *See* 8 U.S.C. § 1182(a)(1)-(10). There are thus arriving noncitizens inadmissible on these other bases who would fall under Section 1225(b)(2), as opposed to Section 1225(b)(1). Section 1225(b)(2) would not be a null set even if narrowly construed.

v.

The BIA acknowledged that the Government's interpretation of § 1225(b)(2) makes it redundant with § 1226(c)'s mandatory detention provisions, and renders superfluous Congress' recent amendment, but nevertheless maintained that this redundant interpretation is not problematic. But as noted above, this conclusion is inconsistent with conventional rules of statutory interpretation. Further, the BIA failed to recognize that interpreting § 1225(b)(2) as district courts have done would not render *any* section of the immigration code superfluous. Under the district courts' interpretation, Section 1225(b)(2) has a role within the statutory framework, applying to arriving aliens inadmissible on grounds other than the two that allow for expedited removal, as noted above.

*vi.*

The BIA's consideration of the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is also unpersuasive. Prior to 1996, the immigration laws distinguished

individuals based on "entry" rather than admission. *Hing Sum v. Holder*, 602 F.3d 1092, 1099 (9th Cir. 2010). Noncitizens who had effected an "entry" into the United States were subject to deportation proceedings, while those who had not made an "entry" were subject to "more summary" exclusion proceedings. *Id.* at 1099–100 (9th Cir. 2010). To remedy this, the IIRIRA substituted "admission for entry" and replaced deportation and exclusion proceedings with a general "removal" proceeding. *Id.* In the BIA's view, this indicates that in enacting IIRIRA Congress sought to create completely level treatment for noncitizens in removal proceedings, regardless of whether they are living in the United States or encountered at the border. It would therefore follow that a provision like § 1225(b)(2) would not differentiate between noncitizens based on their presence in the United States, or the length of that presence.

But the BIA erred in its analysis by identifying *one* of Congress' concerns in enacting IIRIRA and then treating it as Congress's sole concern driving the statute. Congress was indeed focused on ensuring that there was "no reward for illegal immigrants or visa overstayers." H.R. REP. 104-469, 12. But Congress addressed this concern: the IIRIRA consolidated exclusion and deportation procedures into a single procedure and provided that noncitizens "who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization." *Id.* In making these changes, Congress did not fully disrupt the old system, including the system of detention and release. In fact, according to the legislative record, "Section 236(a) [1226(a)] restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." H.R. REP. 104-469, 229. Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a) –the scope of which Congress did not alter. *See Vazquez v. Bostock*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (citing H.R. Rep. No. 104-469, pt. 1, at 229).

*Salcedo Aceros*, 2025 WL 2637503 at *8–12. This Court agrees with the reasoning of *Salcedo* and joins the numerous other district courts that have rejected the government's recent interpretation of the relationship between § 1225 and § 1226.

### b.  *Due Process Clause Protections*

Mr. Ortiz contends that his continued detention violates his due process rights. (*See* Doc. 5-2 at 7.)[4] In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921,

---

[4] The Court does not read Mr. Ortiz's papers to directly suggest that his arrest on June 17, 2025, was unjustified

at *3 (N.D. Cal. July 24, 2025), the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").[5]

---

given that, at that time, he was subject to an *in abstentia* order of removal. Though he draws on cases in which the petitioners did not have removal orders in place upon their arrests, his arguments focus on the propriety of his *continued* detention after his removal proceedings were re-opened.

[5] Respondent relies on cases about the due process rights of aliens in different contexts. For example, they argue:

> [A]liens, like Ortiz, who were not admitted or paroled into the country lack any liberty interest in avoiding removal or to certain additional procedures. 8 U.S.C. § 1225. For these aliens, "[w]hatever the procedure authorized by Congress is, it is due process." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950); *accord Thuraissigiam*, 591 U.S. at 138–139 ("This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil."); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative"); *Knauff*, 338 U.S. at 542 ("At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right.").

(Doc. 10 at 9.) However, as one thorough decision recently issued in the District of Arizona explained, *Thuraissigiam* is distinguishable:

> In *Thuraissigiam* the Supreme Court held that a petitioner who was stopped at the border did not have any due process rights regarding admission into the United States. *Thuraissigiam*, 591 U.S. at 107. In contrast, the pending § 2241 petition does not challenge any determination regarding [petitioner's] admissibility into the United States, but instead involves a challenge to her detention pending the conclusion of her removal proceedings.

*Rosado v. Figueroa*, No. CV 25-02157 PHX DLR (CDB), 2025 WL 2337099, at *15 (D. Ariz. Aug. 11, 2025),

1    Even assuming Respondents are correct that § 1225(b) is the applicable detention authority for all

2    "applicants for admission," Respondents fail to contend with the liberty interest created by the

3    fact that the Petitioner in this case were released on recognizance in 2006, *prior to the*

4    *manifestation of this interpretation*.

5        Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

6    U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

7    applied to Petitioner are sufficient to protect the liberty interest at issue. *Pinchi*, 2025 WL

8    2084921at *3.[6] In *Mathews*, the Court determined the following:

9           [O]ur prior decisions indicate that identification of the specific
            dictates of due process generally requires consideration of three
10          distinct factors: First, the private interest that will be affected by the
            official action; second, the risk of an erroneous deprivation of such
11          interest through the procedures used, and the probable value, if any,
            of additional or substitute procedural safeguards; and finally, the
12          Government's interest, including the function involved and the fiscal
            and administrative burdens that the additional or substitute
13          procedural requirement would entail.

14   During his time on recognizance, Petitioner built a life outside detention, albeit under the shadow

15   of his 2006 *in absentia* removal order. When the government detained Petitioner, it did so under

16   the goal of executing Petitioner's removal order. However, now that Petitioner's removal order

17   has been rescinded by an IJ and his removal proceedings have been reopened, the government

18   lacks a final order of removal under which to subject Mr. Ortiz to expedited removal from the

19   country. Mr. Ortiz has a substantial private interest in being out of custody, which would allow

20   him to continue in these life activities. As other courts have done, the Court concludes that

21   Respondents' interest in continuing to detain Petitioner is slight.

22       As for petitioner, though he did not appear for his initial immigration hearing, there

23   appears to have been a sufficiently good explanation for that failure to warrant the reopening of

24   ─────────────────────

     *report and recommendation adopted sub nom. Rocha Rosado v. Figueroa*, No. CV-25-02157-PHX-DLR (CDB),
25   2025 WL 2349133 (D. Ariz. Aug. 13, 2025).

26   [6] Respondent argues, (Doc. 10 at 8), that the Court should not apply *Mathews*, citing the Ninth Circuit's ruling in
     *Rodriguez Diaz*, 53 F.4th 1206, which noted that the Supreme Court "when confronted with constitutional challenges
27   to immigration detention has not resolved them through express application of Mathews." Yet, after noting that other
     circuits have applied the *Mathews* test to immigration detention issues and the Ninth Circuit has applied *Mathews* in
     other immigration contexts, *Rodriguez Diaz* went on to "assume without deciding" that *Mathews* applied in the
28   immigration context. *Id*. at 1207.

1   his removal proceedings. Apart from that fact, there has been no change in any of his

2   circumstances that would warrant a finding that he is a flight risk or a danger to the community.

3   There is no dispute that he does not have a criminal record.

4          Assuming for purposes of this analysis that the *in absentia* removal order justified Mr.

5   Ortiz's arrest without pre-deprivation process, it does not necessarily follow that ICE could detain

6   him without any notice or opportunity to challenge the basis for his re-detention. However, as Mr.

7   Ortiz points out, under current BIA interpretations, there is no administrative mechanism for him

8   to request a bond hearing from an IJ because such a request will necessarily be denied. Thus, the

9   Court concludes that Mr. Ortiz has demonstrated a likelihood of success on the merits on their

10  Due Process claim.

11         **C.  Irreparable Harm**

12         "It is well established that the deprivation of constitutional rights 'unquestionably

13  constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

14  *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized

15  'irreparable harms imposed on anyone subject to immigration detention' including 'the economic

16  burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*,

17  872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011)

18  (the inability to pursue a petition for review may constitute irreparable harm). The Petitioner has

19  established irreparable harm. (See Doc. 1, ¶ 81.)

20         **D.  Balance of the Harms/Public Interest**

21         Because the interest of the government is the interest of the public, the final two factors

22  merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

23  Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

24              "[T]he public has a strong interest in upholding procedural
                protections against unlawful detention, and the Ninth Circuit has
25              recognized that the costs to the public of immigration detention are
                staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up)
26              (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting
                *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422
27              F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns
                are implicated when a constitutional right has been violated, because
28              all citizens have a stake in upholding the Constitution."). Without the

requested injunctive relief, Petitioner-Plaintiff faces the danger of significant health consequences and deprivation of her liberty. Yet the comparative harm potentially imposed on Respondents-Defendants is minimal—a mere short delay in detaining Petitioner-Plaintiff, should the government ultimately show that detention is intended and warranted. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

This Court therefore joins a series of other district courts that have recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

*Pinchi*, at *3. In addition, as mentioned, there appears to be no dispute that there is no evidence that Petitioner poses a risk of flight or a danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that the balance of the equities and public interest weigh in favor of Petitioner.

**E. Bond**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

1

    **F.**    **Burden of Proof**

2

    Petitioner requests a custody hearing where the government bears the burden of proof.[7]

3

(*See* Doc. 5-2 at 20, 29.) In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth

4

Circuit considered whether a noncitizen detained under § 1226(a) pending removal proceedings

5

had a right to a second bond hearing where the government would have the burden to establish by

6

clear and convincing evidence that his continued detention was justified. *Rodriguez Diaz*

7

concluded that due process did not require that procedure, reasoning in part that:

8

        Nothing in this record suggests that placing the burden of proof on
the government was constitutionally necessary to minimize the risk

9

        of error, much less that such burden shifting would be
constitutionally necessary in all, most, or many cases. There is no

10

        reason to believe that, as a general proposition, the government
will invariably have more evidence than the alien on most issues bearing

11

        on alleged lack of future dangerousness or flight risk.

12

*Id.* at 1212.

13

    However, *Rodriguez Diaz* "held only that a noncitizen detained under section 1226(a)

14

does not have a right to a second bond hearing when the only changed material condition since

15

their first bond hearing is the duration of their detention." *Pinchi*, 2025 WL 2084921, at *4. It did

16

not address the burden of proof applicable under the present circumstances.

17

    *Pinchi* went on to discuss why the calculus changes for an individual who had been

18

paroled from immigration custody after their initial detention:

19

        Even assuming arguendo that the post-detention bond hearing
provided under section 1226(a) provides constitutionally sufficient

20

        process for those noncitizens who have never previously been
detained and released by DHS, [Petitioner's] circumstance is

21

        different. Her release from ICE custody after her initial
apprehension reflected a determination by the government that she

22

        was neither a flight risk nor a danger to the community, and [she]
has a strong interest in remaining at liberty unless she no longer

23

        meets those criteria. The regulations authorizing ICE to release a
noncitizen from custody require that the noncitizen "demonstrate to

24

        the satisfaction of the officer that such release would not pose a
danger to property or persons" and that the noncitizen is "likely to

25

        appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
"Release [therefore] reflects a determination by the government that

26

        the noncitizen is not a danger to the community or a flight risk."
*Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),

27

28

[7] Alternatively, he requests that his re-detention be enjoined unless DHS obtains a further order from this Court.
(Doc. 5-2 at 24.) The Court declines to order that alternative form of relief.

aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). [Petitioner] was apprehended by ICE officers when she crossed the border into the United States [ ]. ICE then released her on her own recognizance. As ICE was not authorized to release [her] if she was a danger to the community or a flight risk, the Court must infer from [her] release that ICE determined she was neither. [Her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4.

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical even for a post-detention custody hearing for the reasons articulated in *Pinchi*–namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

**CONCLUSION AND ORDER**

For the foregoing reasons, the Court **ORDERS:**

1.     Petitioner's Motion for Temporary Restraining Order (Doc. 5) is converted to a Motion for Preliminary Injunction, and it is **GRANTED**.

2.     Because the government has no evidence that Mr. Ortiz poses a risk of flight or poses a danger to the community, Mr. Ortiz **SHALL** be released **IMMEDIATELY** from DHS custody. DHS **SHALL NOT** impose any additional restrictions on him, such as electronic monitoring, unless that is determined to be necessary at a later custody hearing.

3.       Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-arresting or re-detaining Mr. Ortiz absent compliance with constitutional protections, which include at a minimum, predeprivation notice of at least seven days before a predeprivation hearing at which the government will bear the burden of demonstrating by clear and convincing evidence that he is likely to flee or pose a danger to the community if not arrested.

4.       The petitioner may file a further brief on the merits within 21 days. The respondents may file further briefing within 21 days thereafter. Based upon the parties' waiving their right to file further briefs, the Court takes the merits of the habeas petition under submission.

IT IS SO ORDERED.

Dated:   **October 9, 2025**

UNITED STATES DISTRICT JUDGE